NOT FOR PUBLICATION

FILED

JUN 26 2017

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re:                 )    Case No. 15-22434-B-7

PHILIP MICHAEL ROBERTS,   )    Adversary No. 15-2115

           Debtor(s).   )

_____ )

SHARON BARTH,         )

       Plaintiff,     )

v.                   )

PHILIP MICHAEL ROBERTS,   )

       Defendant.     )

_____ )

**DECISION AFTER TRIAL**

**INTRODUCTION**

     This is an adversary proceeding to except debts from discharge under 11 U.S.C. § 523(a)(2)(A) for fraudulent representations (or misrepresentations) and under 11 U.S.C. § 523(a)(4) for defalcation while acting in a fiduciary capacity.

     Plaintiff Sharon Barth initially filed a complaint against defendant Philip Michael Roberts in the Sacramento County Superior Court on June 10, 2014. That state court complaint alleged claims for intentional misrepresentation, breach of fiduciary duty, negligent misrepresentation, and breach of contract. While that state court action was pending, defendant filed a chapter 7 petition in this court on March 31, 2015. The bankruptcy case stayed the state court action.

1　　　　Plaintiff filed the complaint that initiated this adversary
2　proceeding on June 5, 2015.  Defendant filed his answer on July
3　20, 2015.  Trial was held on June 6, 2017.  Appearances were
4　noted on the record.

5　　　　The court takes judicial notice of the docket in this
6　adversary proceeding and in the underlying chapter 7 case.  The
7　court's pre-trial rulings stated on the record are incorporated
8　into and made a part of this decision.  This decision constitutes
9　the court's findings of fact and conclusions of law made pursuant
10　to Federal Rule of Civil Procedure 52(a) applicable by Federal
11　Rule of Bankruptcy Procedure 7052.

12

13　**JURISDICTION AND VENUE**

14　　　　Federal subject matter jurisdiction is founded on 28 U.S.C.
15　§ 1334.  This adversary proceeding is a core proceeding under 28
16　U.S.C. §§ 157(b)(2)(A), (I), and (0).  To the extent this
17　adversary proceeding may ever be determined to be a matter that a
18　bankruptcy judge may not hear and determine without consent, the
19　parties have nevertheless consented to such determination by a
20　bankruptcy judge.  See 28 U.S.C. § 157(c)(2).  Venue is proper
21　under 28 U.S.C. § 1409.

22

23　**BACKGROUND**

24　　　　Plaintiff holds a Bachelor of Science degree in nursing from
25　California State University, Sacramento.  Plaintiff has been a
26　registered nurse since 1991.  From 1990 to 2013 plaintiff worked
27　for Kaiser Foundation Hospitals.  Her last position was as an
28　Assistant Nurse Manager for Roseville and Sacramento hospitals.

1  Plaintiff currently works for the California Department of Public
2  Health as a Health Facilities Evaluator Nurse.

3      Defendant is 39 years old and is plaintiff's son-in-law.
4  Defendant married plaintiff's daughter in 1993.  Defendant and
5  plaintiff's daughter are co-debtors in the underlying chapter 7
6  case.  This adversary proceeding is filed against defendant only.

7      For most of the relevant time, plaintiff lived with
8  defendant and his wife (plaintiff's daughter) and defendant's
9  children (plaintiff's grandchildren) in one household and as a
10 single family unit.  The relationship between plaintiff and
11 defendant was close.  For example, the parties shared living
12 expenses.  Plaintiff and defendant also shared the same
13 accountant and scheduled their respective meetings with the
14 accountant at the same time.  Defendant would regularly sit in on
15 plaintiff's meetings with the accountant; however, during
16 defendant's meetings with the accountant plaintiff was required
17 to wait outside in a car.

18     Plaintiff lived with defendant and his family initially in
19 California.  They all subsequently moved to Florida where they
20 lived until about February 2013 when plaintiff learned that
21 defendant intended to divorce his wife (plaintiff's daughter).
22 Thereafter, defendant returned to California with his 20-year old
23 girlfriend.  Plaintiff returned to California sometime later.

24 I.   PLAINTIFF'S LOANS TO DEFENDANT

25     A.   The "House-Flipping" Loans

26     From 2004 to 2006 plaintiff made a series of loans to
27 defendant.  Defendant repaid each of the loans that were made
28 during that period.

In 2006 defendant became a licensed contractor.  He began working under the name Diamond Lighting Designs.  Defendant's contractor license is currently inactive.

Beginning in the spring of 2009 plaintiff loaned defendant money so that defendant could purchase, renovate, and resell residential properties, *i.e.*, "house-flipping".  Defendant told plaintiff that he would renovate the residential properties he purchased with loans from her and that he would repay her the loan principal at 10% interest when he resold a renovated property.  Thereafter, with three separate loans from the plaintiff (collectively, unless noted otherwise, the "House-Flipping" loans), defendant purchased three residential properties identified as: (1) 2628 Lexington St., Sacramento, CA ("Lexington"); (2) 5700 Brett Dr., Sacramento, CA ("Brett"); and (3) 2132 Tevis Rd., Sacramento, CA ("Tevis").

The House-Flipping loans were all verbal agreements.  There are no loan documents or promissory notes to evidence any of the loans.[1]

### 1.  The Lexington Loan

In May of 2009 plaintiff loaned defendant $24,000.00 to purchase Lexington.  Defendant purchased Lexington for $19,521.45 and made renovations to the property.

Defendant encountered difficulties selling Lexington and so he convinced plaintiff to buy the property from him for

---

[1]To be clear, the funds that plaintiff gave defendant to buy the three residential properties were loans.  Plaintiff did not give those funds to defendant as an investment or as a gift and she was not defendant's partner in the "house-flipping" business.

1  $95,000.00 based on a representation that the purchase would

2  allow plaintiff to recoup a portion of her loan for the initial

3  purchase of the property and preserve equity.  Defendant also

4  told plaintiff that he would manage the property as a rental for

5  plaintiff.

6      Defendant received $93,254.00 from escrow upon the close of

7  the Lexington sale.  According to plaintiff, Lexington is

8  currently worth approximately $145,000.00.

9          2.  The Brett Loan

10     In August of 2009 plaintiff loaned defendant $125,715.58 to

11 purchase, renovate, and resell Brett.  Defendant purchased Brett

12 for $91,692.55.

13     Defendant renovated Brett and resold the property in

14 December 2009 for $138,504.58.  Defendant received $125,711.00

15 from the sale.

16     Plaintiff's Exhibits 1 and 23 reflect that defendant repaid

17 plaintiff at least $107,899.00 when he resold Brett.  Plaintiff's

18 Exhibit 1 is a spreadsheet that plaintiff testified is true and

19 correct and was prepared for this litigation.  That spreadsheet

20 includes a section at Exhibit 1-2 captioned "Funds Repaid to

21 Sharon" which reflects a "payment" of $60,000.00 and a "payment"

22 of $47,899.00, for a total of $107,899.00.  Those payments

23 correspond with plaintiff's Exhibit 23-1 which is a spreadsheet

24 that defendant prepared after he resold Brett and which reflects

25 a payment to "Sharon" of "$107,899.00".[2]

26

27     [2]Plaintiff denied that defendant repaid $107,899.00 of the
   Brett loan.  Plaintiff's denial is not credible and the court
28 believes that defendant repaid at least $107,899.00 of that loan.

### 3.   The Tevis Loan

From October 2009 and into 2010 plaintiff loaned defendant a total of $195,475.00 to buy, renovate, and resell Tevis which defendant purchased for $120,000.00.

After making renovations, defendant resold Tevis in December 2010 for $192,000.00  He received approximately $173,605.91 from that sale.  In December of 2010, defendant also repaid plaintiff $165,540.00 from the Tevis sale.

### B.   Medical Charting Business Loan

In May of 2010, defendant induced plaintiff to loan him $6,000.00 so that he could invest in a computerized medical chart business.  Plaintiff took a cash advance on a credit card and incurred fees and finance charges to make this loan to defendant. In addition, defendant induced plaintiff to give him an additional $6,000.00 for plaintiff's own investment in the same computerized medical chart business.

Defendant did not provide plaintiff with any evidence of his purchase of shares of the computerized medical chart business. It was not until March of 2013 that plaintiff discovered that all of the shares of the medical chart business that defendant purchased with the $6,000.00 she loaned defendant and the

---

The court does not believe plaintiff's denial because plaintiff's testimony became evasive and contradictory when she was asked about the two payments totaling $107,899.00 on Exhibit 1-2 and the payment of $107,899.00 from the Brett sale on Exhibit 23-1. Plaintiff testified that the section of Exhibit 1-2 that referenced the two payments totaling $107,899.00 was included by her former attorney and then immediately thereafter stated she could not answer or explain how that section was included on the spreadsheet.  Plaintiff also testified she had no record of any "deposit" of the two payments which is different from not having any record of "receipt" of the payments.

1 | additional $6,000.00 she gave defendant for her purchase of
2 | shares were placed in defendant's name.

3 |     C.    Tevis Litigation Loan

4 |     In 2012 plaintiff and defendant were sued for construction
5 | defects arising out of Tevis renovations.  Defendant paid the
6 | litigation expenses and attorney's fees totaling $16,724.44
7 | incurred in that matter.  Plaintiff paid those expenses based on
8 | defendant's representations that he would repay them all.

9 | **II.   LEXINGTON PROPERTY MANAGEMENT**

10 |     After plaintiff bought Lexington from defendant, defendant
11 | acted as a property manager for Lexington from approximately June
12 | 2010 through March 2013 as he initially told plaintiff he would.
13 | There is no written property management agreement.  The agreement
14 | was entirely verbal.

15 |     Defendant was not a licensed real estate broker or agent
16 | when he managed Lexington.  Defendant managed Lexington for
17 | plaintiff solely in his capacity as plaintiff's relative by
18 | marriage.  Put another way, defendant managed Lexington as
19 | plaintiff's son-in-law.

20 |     Although defendant provided his accountant with financial
21 | information about Lexington between 2010 and 2013, he did not
22 | provide plaintiff with any similar accounting during that same
23 | period.  Defendant also refused to provide plaintiff with bank
24 | records relevant to his management of Lexington when plaintiff
25 | requested those documents in or about March 2013.

26 |     It was not until after plaintiff terminated defendant as the
27 | Lexington property manager in March of 2013 that she learned
28 | rents defendant collected from Lexington tenants between 2010 and

- 7 -

2013 were not deposited into a separate account and were deposited into the defendant's business account. This included a security deposit which defendant received from one tenant and used as a partial refund of a security deposit owed to another tenant. Defendant's testimony confirmed this. In March 2013, plaintiff also discovered that bills associated with Lexington had not been paid and, in fact, tax and utility bills for the property remained unpaid or underpaid. Defendant's testimony also confirmed this. And in March of 2013, plaintiff also discovered that defendant charged for repairs to Lexington that were never performed. Testimony of Lexington tenant Rose Scott confirmed this.

**DISCUSSION**

**I.   THE § 523(a)(2)(A) CLAIMS**

Plaintiff seeks to have several loans she made to defendant declared non-dischargeable under 11 U.S.C. § 523(a)(2)(A) which states as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt -
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

Plaintiff's § 523(a)(2)(A) claims as they pertain to her loans to defendant are based on misrepresentation theories. The misrepresentations alleged to have been made by the defendant to

the plaintiff are as follows:

(1)  from 2007 through 2010, regarding the terms of repayment for the House-Flipping loans;

(2)  in or about May 2010, regarding the purchase of shares in a computerized medical chart business;

(3)  in or about July 2010, regarding the recoupment of a portion of the Lexington loan and preservation of equity if plaintiff purchased that property from defendant;

(4)  from July 2010 through March 2013, regarding activities and irregularities while acting as property manager of Lexington; and

(5)  in 2012 regarding the expenses incurred in Tevis construction defect litigation against plaintiff and defendant.

A creditor seeking to except a debt from discharge under § 523(a)(2)(A) based on a misrepresentation theory must establish five elements: (1) misrepresentation(s), fraudulent omission(s), or deceptive conduct; (2) knowledge of the falsity or deceptiveness of such representation(s), omission(s), or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor; and (5) damage to the creditor proximately caused by its reliance.[1] Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219,

---

[1] The court is aware of Husky Int'l Elecs., Inc. v. Ritz, 136 S. Ct. 1581 (2016). Plaintiffs who file § 523(a)(2)(A) claims often cite Husky, sometimes as an after-thought when they have failed to establish a misrepresentation, for the proposition that misrepresentation is not an element of a § 523(a)(2)(A) claim. However, in Husky itself the Supreme Court acknowledged that it was not altering the requirement that a plaintiff prove traditional § 523(a)(2)(A) elements when a § 523(a)(2)(A) claim is based on a misrepresentation theory. Id. at 1589-90. A number of lower courts have reached the same conclusion. In re Jahedi, 2017 WL 1034681, *4 n.4 (Bankr. C.D. Cal. 2017); In re Katchtourian, 2016 WL 4267937, *4 n.3 (Bankr. C.D. Cal. 2016); see also In re Matthews, 2016 WL 5746251, *16 (Bankr. C.D. Cal. 2016). A few courts have even suggested that Husky is limited to actual fraud claims in the context of fraudulent transfer

1  1222 (9th Cir. 2010); <u>Shannon v. Cardenas (In re Shannon)</u>, 553

2  B.R. 380, 388 (9th Cir. BAP 2016).  All elements must be

3  established by a preponderance of the evidence.  <u>Grogan v.</u>

4  <u>Garner</u>, 498 U.S. 279, 291 (1991).

5      As explained below, plaintiff has failed to carry her burden

6  of proving that defendant obtained the "House-Flipping" loans and

7  part of the computerized medical chart loan by false

8  representations (or misrepresentations).  Plaintiff has also

9  failed to prove that her reliance on defendant's representations

10 that he would repay plaintiff the Tevis litigation expenses was

11 justified.  Therefore, defendant's debts to plaintiff arising out

12 of those obligations will be discharged.  On the other hand, as

13 to a part of computerized medical chart loan and the loss that

14 plaintiff suffered as a result of defendant's management of

15 Lexington, defendant's debts to plaintiff arising out of those

16 obligations will not be discharged.

17      A.  <u>The Loans</u>

18          1.  <u>The "House-Flipping" loans are dischargeable and
               will be discharged.</u>

19

20          a.  <u>Recovery on the "House-Flipping" loans is
               barred by the statute of limitations.</u>

21      A non-dischargeability action involves two separate and

22 distinct causes of action:  "one is on the debt, as determined by

23 state law, and the other is on the dischargeability of that debt,

24

25 schemes.  <u>See</u> <u>In re Castro</u>, 2016 WL 5879596, *9 n. 25 (Bankr.

26 N.D. Cal. 2016); <u>see also</u> <u>Yim v. Chaffee (In re Chaffee)</u>, 2017 WL
   1046057, *8 (9th Cir. BAP 2017).  In any case, inasmuch as

27 plaintiff's § 523(a)(2)(A) claims are based on misrepresentation
   theories, fraudulent representations (or misrepresentations)

28 and/or omissions remains element of the claims.

as determined by federal law." <u>Roussos v. Michaelides (In re</u>
<u>Roussos)</u>, 251 B.R. 86, 93 (9th Cir. BAP 2000). Here, the "House-
Flipping" loans are all barred by the statute of limitations
which means that, as to those loans, there are no actionable
debts to except from discharge under § 523(a)(2)(A).

There are two statute of limitations issues in the § 523(a)
context. <u>Banks v. Gill Distribution Ctrs., Inc. (In re Banks)</u>,
263 F.3d 862, 868 (9th Cir. 2001). One arises under Federal Rule
of Bankruptcy Procedure 4007(c) and is a deadline for filing the
§ 523(a) complaint. <u>Id</u>. That one is met here and is not at
issue. The other relates to the underlying debt which the
plaintiff seeks to have declared non-dischargeable. "[T]he
establishment of the debt itself ... is subject to the applicable
state statute of limitations." <u>Id</u>. Thus, "[a] debt barred by
the applicable state statute of limitations will not support a
dischargeability action." <u>In re Moore</u>, 2014 WL 3570600, *5
(Bankr. E.D. Cal. 2014) (citing <u>Banks</u>, 263 F.3d at 868)).

Inasmuch as the § 523(a)(2)(A) claims that pertain to the
"House-Flipping" loans are based on misrepresentations they are
grounded in fraud. The statute of limitations for fraud claims
in California is three years. <u>See</u> Cal. Code Civ. Proc. § 338(d).

Sequentially, any fraud associated with the Brett loan was
or should have been known as late as January 2010, after that
property sold in December 2009 and plaintiff received a
spreadsheet from defendant accounting for the sale. Any fraud
associated with the Lexington loan was or should have been known
by July 2010 when plaintiff purchased that property from the
defendant. And any fraud associated with the Tevis loan was or

should have been known by December 2010 when that property was
sold and plaintiff received a spreadsheet from the defendant
accounting for the sale.  There were no other payments on the
loans after December 2010.

This adversary proceeding was filed on June 5, 2015, which
is outside the applicable three-year limitations period for fraud
associated with the House-Flipping loans.  The court is aware
that plaintiff filed a state court action against the defendant
on June 10, 2014.  And it is true that an underlying claim may
not be time-barred for non-dischargeability purposes if it was
asserted in a timely-filed pre-petition action even if that pre-
petition action is not litigated to a final judgment.  Banks, 263
F.3d at 868; see also Jett v. Sicroff (In re Sicroff), 401 F.3d
1101, 1103 n.3 (9th Cir. 2005).  Here, however, the complaint
that initiated the state court action against the defendant was
not timely insofar as it was filed in June of 2014, which means
it was filed over six months after the applicable limitations
period lapsed, at the latest, in December of 2013 following the
cessation of payments on the House-Flipping loans.

In sum, there are no actionable fraud claims with respect to
the House-Flipping loans which means there are no actionable
debts created by any of those loans to except from discharge
under § 523(a)(2)(A).  Therefore, defendant's debts to plaintiff
arising out of the House-Flipping loans are dischargeable and
will be discharged as to the defendant in his chapter 7 case.

- 12 -

b.   Even if not time-barred, plaintiff did not
prove that defendant obtained the "House-
Flipping" loans by false representations (or
misrepresentations) or an intent to deceive.

As they pertain to the House-Flipping loans, plaintiff's §
523(a)(2)(A) claims are fraudulent inducement claims.  The focus
of such claims are the misrepresentations made at loan inception.
Ghadimi v. Ashai (In re Ashai), 211 F. Supp. 2d 1215, 1236 (C.D.
Cal. 2016) (citing Hopper v. Lewis (In re Lewis), 551 B.R. 41, 48
(Bankr. E.D. Cal. 2016)); Husain v. Chopra (In re Chopra), 2013
WL 1681773, *8 (Bankr. N.D. Cal. 2013) ("To establish a
non-dischargeable debt under section 523(a)(2)(A), the 'target
misrepresentation must have existed at the inception of the debt,
and a creditor must prove that he or she relied upon that
misrepresentation.'").  And as to representations made at loan
inception, "[t]he intention not to perform must be present when
the agreement is formed; otherwise only a breach of contract is
proven."  In re Yaikian, 508 B.R. 175, 186 (Bankr. S.D. Cal.
2014).  Moreover, false representations made after the defendant
obtains the loan do not count and will not support a non-
dischargeability claim under § 523(a)(2)(A).  See Houng v.
Tatung, Co., Ltd. (In re Houng), 499 B.R. 751, 766 n. 49 (C.D.
Cal. 2013), aff'd, 636 Fed. Appx. 396 (9th Cir. 2016); Burlington
Indus., Inc. v. Wilson (In re Wilson), 114 B.R. 249, 252 n.9
(Bankr. E.D. Cal. 1990).

The misrepresentations made at loan inception here pertain
to the terms of repayment.  In other words, plaintiff asserts
that defendant's representations that defendant would repay loan
principal at 10% interest when a residential property was resold

- 13 -

were made to induce her to enter into the House-Flipping loans
and at the time defendant made those representations he had no
intention of performing any of those terms. Although it is true
that the House-Flipping loans were not repaid according to their
promised terms, it is also significant that each of those loans
were in some measure repaid after defendant renovated and sold
each of the respective residential properties.

Plaintiff received at least $107,899.00 in repayment of the
Brett loan, $165,540.00 in repayment of the Tevis loan, and over
$25,000.00 in the form of equity in repayment of the Lexington
loan. Thus, in addition to renovating each of the residential
properties that defendant purchased with the House-Flipping loan,
defendant in some manner attempted to repay each of those loans.
That he failed and was unable to do so does not mean that he had
no intent to perform when each loan was made. In fact,
plaintiff's expert witness Lee Bartholomew testified that the
movant lost a little over 10% in value on a unit basis during the
2009-2010 period. Thus, it is entirely plausible that
defendant's inability to repay the House-Flipping loans as he
initially promised resulted from circumstances outside of his
control.

The important point here is that defendant renovated each of
the three properties he purchased with loans from the plaintiff
and made an effort to repay plaintiff following renovations and
resales. In fact, defendant repaid plaintiff a substantial
portion of each of the House-Flipping loans. Those repayments
support a benign intent rather than fraud. See Anastas v. Am.
Savings Bank (In re Anastas), 94 F.3d 1280, 1287 (9th Cir. 1996)

- 14 -

1 (partial payment supports no intent to defraud). They also

2 reflect that defendant's statements that he would repay plaintiff

3 were not false at the time they were made.

4      At best, defendant breached his oral agreements with the

5 plaintiff. However, a contractual breach does not give rise to

6 an actionable claim for non-dischargeability under §

7 523(a)(2)(A). <u>See In re King</u>, 258 B.R. 786, 794-95 (Bankr. D.

8 Mont. 2001); <u>see also Arciniega v. Clark (In re Arciniega)</u>, 2016

9 WL 455428, *11 (9th Cir. BAP 2016) (damages based on a mere

10 breach of contract, even an intentional breach, are not excepted

11 from discharge under § 523). Therefore, if not barred by the

12 statute of limitations, for these alternative reasons defendant's

13 debts to plaintiff arising out of the House-Flipping loans are

14 dischargeable and will be discharged as to the defendant in his

15 chapter 7 case.

16          2.    <u>The computerized medical chart loan is partially</u>
                 <u>non-dischargeable and will not be fully</u>
17               <u>discharged.</u>

18      On the other hand, defendant's representation to plaintiff

19 that he would invest $6,000.00 for her was false and was known by

20 the defendant to be false when it was made. By placing all

21 shares purchased for $12,000.00 in his name upon purchase, the

22 court is persuaded that defendant had no intention of putting any

23 of the shares in plaintiff's name and defendant told plaintiff

24 that he would put $6,000.00 of the shares in her name so that he

25 could obtain an additional $6,000.00 from her for his personal

26 benefit. Therefore, the $6,000.00 that plaintiff gave defendant

27 for her purchase of shares is not dischargeable and as to the

28 defendant will not be discharged in his chapter 7 case.

As to the other $6,000.00 that plaintiff loaned defendant to use for *his* investment, the court is not persuaded plaintiff obtained those funds from the plaintiff by misrepresentation. After all, defendant invested those funds on his behalf as he told plaintiff he intended to do. Nor is the court persuaded that plaintiff's reliance on defendant's representation that he would repay funds he borrowed from the plaintiff for his investment is justified. Investments inherently involve risk and that risk includes loss. Therefore, as to this $6,000.00, it is dischargeable and will be discharged as to the defendant in his chapter 7 case.

        3.   <u>The Tevis litigation costs are dischargeable and will be discharged.</u>

As to the 2012 Tevis litigation costs, plaintiff's reliance on defendant's representations that he would repay plaintiff for her payment of those expenses is not justifiable. <u>See</u> <u>Field v. Mans</u>, 516 U.S. 59, 74-75 (1995). Reliance falls below the justifiable standard when "red flags" are ignored. <u>Anastas v. Am. Sav. Bank (In re Anastas)</u>, 94 F.3d 1280, 1286 (9th Cir.1996) (citation omitted); <u>In re Semenyuk</u>, 2015 WL 5177818, *4 (Bankr. E.D. Cal. 2015). And here, "red flags" were ignored.

By 2012 plaintiff had experienced problems with defendant's repayment of the House-Flipping loans. There was some repayment; however, as discussed above, those loans were not repaid according to their promised terms. Despite those breaches, plaintiff chose to advance defendant additional funds in the form of the Tevis litigation expenses in reliance on defendant's representation those too would all be repaid.

- 16 -

Given defendant's loan repayment history in 2012, particularly his failure to repay the House-Flipping loans as initially promised, plaintiff was not justified in relying on defendant's representation that he would repay her the 2012 Tevis litigation expenses. See Copper v. Lemke (In re Lemke), 423 B.R. 917, 924 (10th Cir. BAP 2010) (holding that reliance was not justifiable because plaintiff continued to lend money "after various red flags arose"). Therefore, defendant's debt to plaintiff arising out of the 2012 Tevis litigation expenses is dischargeable and as to the defendant will be discharged in his chapter 7 case.

B. The Fraudulent Concealment Claim

The § 523(a)(2)(A) claim as it pertains to defendant's misrepresentations in his capacity as the Lexington property manager is based on omissions. In other words, defendant kept material financial information regarding rents collected, bills and taxes paid, security deposits, and repairs from plaintiff while working as the Lexington property manager for plaintiff.

An omission can satisfy the misrepresentation element of § 523(a)(2)(A) if there is a duty to disclose. Citibank (South Dakota) N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1089 (9th Cir. 1996); Bacino v. Federal Deposit Ins. Co. (In re Bacino), 2015 WL 9591904, *23 (9th Cir. BAP 2015); see also Cooke v. Howarter (In re Howarter), 114 B.R. 682, 684 n.2 (9th Cir. BAP 1990) (noting that the debtor's silence or concealment of a material fact can create a false impression which constitutes a misrepresentation actionable under § 523(a)(2)(A)). Here, however, because defendant managed Lexington as plaintiff's son-

in-law and not as a licensed real estate broker or agent, as
plaintiff's expert witness Linda Ruteledge testified, under
California real estate law, defendant was not a fiduciary.   Thus,
at least under California real estate law, defendant would not
have had a duty of disclosure.

However, California law recognizes that in transactions that
do not involve a fiduciary duty to disclose the non-disclosure of
material facts may nevertheless be actionable in three instances:
(1) if the defendant makes representations but does not disclose
facts which materially qualify the facts disclosed, or which
render the disclosure likely to mislead; (2) if the facts are
known or accessible only to defendant, and defendant knows they
are not known to or reasonably discoverable by the plaintiff; or
(3) if the defendant actively conceals discovery from the
plaintiff.   Marketing West, Inc. v. Sanyo Fisher (USA) Corp., 6
Cal. App. 4th 603, 613 (1992) (citation omitted).   The second and
third instances are applicable here.

Inasmuch as plaintiff testified that defendant did not
disclose any financial information relevant to his management of
Lexington, there could not have been any partial disclosure by
the defendant that required further disclosure or rendered any
partial disclosure misleading.   However, defendant provided
financial information about Lexington and his management of
Lexington to his accountant.   And while plaintiff and defendant
shared the same accountant, plaintiff did not have access to
information defendant provided to their accountant.   That means
the financial information that defendant provided the accountant
he shared with plaintiff about Lexington was known only to the

defendant and the accountant, and defendant knew that financial
information was not known to or reasonably discoverable by the
plaintiff.  In addition, when plaintiff asked defendant for bank
records to substantiate an accounting of his activities as the
Lexington property manager defendant refused to produce those
records.  Thus, defendant also actively concealed financial
information about Lexington from the plaintiff.

The court is persuaded that defendant had financial
information relevant to Lexington and his management of Lexington
under his control that he knew only he had access to and which
was not discoverable by the plaintiff or, alternatively,
defendant actively concealed that financial information from the
plaintiff.  Both circumstances give rise to an obligation to
disclose under California law the failure of which is an omission
that satisfies the misrepresentation element of plaintiff's §
523(a)(2)(A) claim.  The court is also persuaded that defendant
withheld that financial information from the plaintiff because of
irregularities and improprieties in the collection of rents, the
deposit of rents collected into defendant's business bank
account, payment of bills and taxes, misuse of a security
deposit, and a non-existent repair claim.  The court was
presented with no evidence of any "red flags" that would have
alerted plaintiff to any of these irregularities which plaintiff
only discovered in or around March of 2013 making her reliance on
defendant's management of Lexington justified.  Therefore, as the
damage caused by defendant's omissions related to his management
of Lexington in the amount of $9,684.13, that amount is not
dischargeable and will not be discharged as to the defendant in

1   his chapter 7 case.

2   **II.   THE § 523(a)(4) CLAIM**

3      The second claim for relief is based on plaintiff's alleged

4   role as a fiduciary to the plaintiff as Lexington's property

5   manager and a purported broker for plaintiff's investment in the

6   computerized medical chart business. As explained below, the

7   court concludes that neither are a § 523(a)(4) fiduciary.

8      Section 523(a)(4) excepts from discharge a debt "for fraud

9   or defalcation while acting in a fiduciary capacity." To except

10   a debt from discharge under § 523(a)(4), a creditor must prove by

11   a preponderance of the evidence, <u>Lovell v. Stanifer (In re</u>

12   <u>Stanifer)</u>, 236 B.R. 709, 713 (9th Cir. BAP 1999), an express

13   trust, the debt was caused by fraud or defalcation, and the

14   debtor acted as a fiduciary to the creditor at the time the debt

15   was created. <u>Otto v. Niles (In re Niles)</u>, 106 F.3d 1456, 1459

16   (9th Cir. 1997). The focus here is the third element.

17      The definition of "fiduciary capacity" under § 523(a)(4) is

18   a question of federal law. <u>See Mills v. Gergely (In re Gergely)</u>,

19   110 F.3d 1448, 1450 (9th Cir. 1997). The Ninth Circuit has held

20   that the broad, general definition of fiduciary—a relationship

21   involving confidence, trust and good faith—is inapplicable in the

22   dischargeability context. <u>Double Bogey, L.P. v. Enea</u>, 794 F.3d

23   1047, 1050 (9th Cir. 2015) (quoting <u>Ragsdale v. Haller</u>, 780 F.2d

24   794, 796 (9th Cir. 1986))). Thus, a "fiduciary" for purposes of

25   § 523(a)(4) "must be one arising from an express or technical

26   trust that was imposed before and without reference to the

27   wrongdoing that caused the debt." <u>Lewis v. Scott (In re Lewis)</u>,

28   97 F.3d 1182, 1185 (9th Cir. 1996). However, notwithstanding the

"technical" or "express" trust requirement, "state law may create a fiduciary relationship whose breach leads to nondischargeability under § 523(a)(4)."  <u>Shcolnik v. Rapid Settlements, Ltd. (In re Shcolnik)</u>, 670 F.3d 624, 628 (5th Cir. 2012).

Plaintiff produced no evidence of any express or statutory trust.  In fact, plaintiff testified that no trust or trust agreement existed.  Moreover, as explained above, as the plaintiff's son-in-law, defendant was not a fiduciary under California real estate law as Lexington's property manager.[2] Typically, that would end the inquiry.  However, during closing argument plaintiff cited <u>In re Douglass</u>, 2015 WL 6446305 (Bankr. E.D. Tex. 2015), in which that court stated that "[i]t has been recognized that 'family relationships—where a person trusts in and relies upon a close member of her core family unit—may give rise to a fiduciary duty.'"  <u>Id</u>. at *26.  This court disagrees with <u>Douglass</u> for several reasons.

First, <u>Douglass</u> was decided under Texas not California law. Second, inasmuch as plaintiff's expert witness Linda Ruteledge testified that under California law defendant was not a fiduciary as Lexington's property manager *because of* his family relationship with the plaintiff, the <u>Douglass</u> holding that the family relationship created a fiduciary duty is at odds with

---

[2]Plaintiff alleged that defendant was also a fiduciary as a broker for *her* investment in the computerized medical chart business.  However, as explained above, since all shares the defendant purchased for the $12,000.00 that plaintiff gave him were placed in defendant's name, defendant did not invest for plaintiff.  He invested entirely for himself.

1  California law.  Third, family relationships that create

2  fiduciary relationships under California law within the scope of

3  § 523(a)(4) appear to be very limited and the mother-in-law/son-

4  in-law relationship does not appear to be one of them.  See e.g.,

5  Stanifer, 236 B.R. at 717 (spouses with respect to community

6  property).  Fourth, to the extent it relies on a close personal

7  and confidential relationship among family members, Douglass is

8  inconsistent with the Ninth Circuit's definition of a § 523(a)(4)

9  fiduciary.

10       In short, plaintiff has not established that defendant acted

11  as a § 523(a)(4) fiduciary.  Therefore, judgment on the Second

12  Claim for Relief will be entered in favor of the defendant and

13  against the plaintiff with plaintiff taking nothing on the Second

14  Claim for Relief.

15  **III. PUNITIVE DAMAGES**

16       Assuming the court has authority to award punitive damages

17  in a § 523(a)(2)(A) non-dischargeability action, see In re

18  Harper, 475 B.R. 540, 550 n. 24 (Bankr. S.D. Miss. 2012), as to

19  plaintiff's request for punitive damages the court finds that the

20  facts do not warrant any award of punitive damages in this

21  matter.  Although perhaps not according to their terms and not in

22  the amounts promised, defendant made efforts to repay, and in

23  fact did repay, a substantial amount of the money he borrowed

24  from or that was extended by plaintiff.  These facts do not meet

25  (or even come close to) the heightened standard of conduct

26  required for an award of punitive damages.  Therefore,

27  plaintiff's request for punitive damages will be denied.

28

- 22 -

**CONCLUSION**

Based on the foregoing,

IT IS ORDERED that judgment on the First Claim for Relief will be entered for the plaintiff and against the defendant in the amount of $15,684.13 which amount shall be non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

IT IS FURTHER ORDERED judgment on the claim under 11 U.S.C. § 523(a)(4) in the Second Claim for Relief will be entered for the defendant and against the plaintiff with plaintiff taking nothing on the Second Claim for Relief.

IT IS FURTHER ORDERED that plaintiff's request for punitive damages is denied and no punitive damages are awarded.

IT IS FURTHER ORDERED that all other debts that defendant owes plaintiff which are not held to be non-dischargeable as provided herein shall be ordered discharged as to defendant in his chapter 7 case.

IT IS FURTHER ORDERED that the continued trial date of July 3, 2017, at 9:30 shall be and hereby is vacated.

Dated:   June 26, 2017.

UNITED STATES BANKRUPTCY JUDGE

**INSTRUCTIONS TO CLERK OF COURT**
**SERVICE LIST**

    The Clerk of Court is instructed to send the attached document, via the BNC, to the following parties:

Karen M. Goodman
3840 Watt Ave., Bldg. A
Sacramento CA 95821


Peter G. Macaluso
7230 South Land Park Drive #127
Sacramento CA 95831